**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN JAMES VAN DRUTEN,<br><br>                                        Petitioner,<br><br>v.<br><br>NEIL MCDOWELL, Warden,<br>Ironwood State Prison<br><br>                                        Respondent. | Case No.:  3:21-cv-00555-BEN (NLS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[ECF No. 1]** |

## I.      INTRODUCTION

Petitioner John James Van Druten ("Petitioner"), a state prisoner, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction for six counts of lewd acts upon a child and two counts of child molestation, in case number SCS293976.  (ECF No. 1 at 2.)  Respondent filed an answer, arguing that Petitioner's petition fails on the merits, and lodged the state court records.  (ECF No. 6 ("Lodgment"); ECF No. 7.)  Petitioner then filed a traverse.  (ECF No. 8.)  After reviewing the parties' submissions and the lodgments, and for the reasons discussed below, the Court **RECOMMENDS** the petition be **DENIED**.

///

///

1

## II.     FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal opinion:[1]

> After spending several years in Arizona during his military service, G. moved back to San Diego with his wife, S., and their children: four-year-old daughter, A. (the victim), and a two-year-old son. In August 2016, they moved into a combined family home with G.'s mother, and S.'s mother and father (Van Druten). Eight months later, in April 2017, as S. was getting the children showered before bedtime, A. told S. that Van Druten (whom A. called "grandpa") had shown her his "canar[y]," and it "is pink." A. also said that grandpa had shown her a video of "a boy with white pee going into a lady's mouth." S. asked A. if grandpa had touched her, and she said no. S. asked if A. had touched grandpa, and initially A. said no. However, after S. gave A. a hug and told her it was a good thing that A. told her these things, A. said, "maybe [she had] lied, maybe . . . [she] did touch him."

> S. confronted Van Druten, who immediately apologized and said "it will never happen again." He denied touching A. and denied that A. touched him. S. and G. filed a police report. Several days later, Van Druten sent S. an email with the subject line, "My asking for forgiveness," which stated:

> > "I write this knowing that I have wronged your family, and I truly am so very sorry. I really need some help for my problem, and I am sure that you're all angry. If I could find a highly recommended place for sexual addiction, I would welcome that as a beginning event for help. God forgives all sinners, and I have prayed much in the past few days. I am a Christian that sinned. Lord heal us.

> > Bills are coming due soon. I am willing to pay my share as long as I work. Mom could help you with that. I know you have many decisions, like will you stay at [the home.] I know that I have lost my rights to you and your family. That is a big price to pay.

---

[1] This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from those facts, are entitled to statutory presumption of correctness).  Here, Petitioner's sole argument in his petition is that the trial court erred in admitting one piece of evidence.  Thus, he does not raise a direct challenge to any of these facts.

I know that my life is in danger, but I hope that feeling diminishes. I will not come near the home. I promise you that.

I have made many steps to repent to God and ask him for forgiveness. Your family may not, but I do pray for that.

You may wish to see me suffer. I understand that.

I don't want to be incarcerated. I want to keep working. And if you sell the house, I am willing to let you keep all the equity while I keep working, stay away from your family, and start anew with your mother.

I need help with this. You're a Christian. We are all sinners. I want help to fix me. I have never done something like this before. I need someone who specializes in this to dig deep and really help me.

Help me, please. I need to fix myself. . . . John"

*Forensic Interview*

Police investigators arranged a forensic interview of A. at the local children's hospital. A., five years old at the time, told the forensic interviewer that her grandpa locked the door when they were in the bathroom, "showed out his, his bird," and "did this," gesturing as if she were masturbating a penis. She said he was lying down on the floor in the bathroom while this occurred and "white stuff came out and went on his belly." A. described "the white stuff" as looking "like milk." She said her grandpa told her "it was sticky." She said, "He said it was fun, but it wasn't fun for me. [¶] . . . [¶] [I]t was bad for me." She said, "he would do [it] like every day." A. said, "my grandpa tells me I have to keep it a secret from my mom and dad," but that she did not keep it a secret because it is "good" "to tell the truth."

A. told the forensic interviewer grandpa wants her to touch his "bird" a lot and "sometimes" she touched it "a little." Pointing to her groin, she said, "This keeps my grandpa warm, and his bird makes me warm. [¶] . . . [¶] [B]ut I don't like that." She said this happened "because I put it on my grandpa's bird, but with his pants on and mine," and then "we hug."

A. said that grandpa "likes touching his bird, and he likes doing it," and "he also does it on his bed." A. said that she knows grandpa "likes [her] vagina" because "he told me."

A. described an incident where she pulled her pants down and "touched his bird again." "And then he did this again," she said, gesturing as if masturbating a penis, and "then he rinsed it off with water." A. said she pulled her pants down "[b]ecause he just wanted to see it," and he "said that it looks pretty."

A. said these things happened in her grandpa's bedroom and bathroom during the day while her mom and dad were at work, and her grandma was downstairs.

A. described an incident where her grandpa "went pee and I, and I had to hold it, my grandpa said." She said, "I had to hold his bird . . . ." while he "went pee" "[i]n the toilet." She said she "swished it around." Another time, she said, "his water didn't work anymore, so he went in the tub."

A. said she locked the door when she was in grandpa's room. She said she liked going in grandpa's room because he had snacks, like chips, pretzels, doughnuts, chocolate raisins, and marshmallows.

A. initially denied having seen movies with people without clothes, but later told the interviewer that her grandpa used his tablet to show her "yucky movies" "about what he does." She said the movies had "boys and girls" and "the guys were, were putting their bird into the girl." When asked what part of the girl, A. gestured to her groin.

*Trial*

    *S. (Mother)*

At trial, S. recounted for the jury A.'s disclosure regarding grandpa's "canary" and read the email Van Druten had sent. She also recounted an incident that occurred in the shared family home some time prior to the "canary" discussion. She was with her husband when she overheard Van Druten tell A., "don't forget our secret." After Van Druten left the room, her husband approached A. and asked what secret they were talking about. A. referenced "the candy, the chocolate that [she] ate." S. said this made sense

4

at the time because A. was not supposed to be consuming candy as she recently had dental issues.

S. testified that, when she came home from work, A. would sometimes be in Van Druten's room. This occurred "less than half the time."

S. also recounted an incident that occurred when she was five years old. She recalled being in Van Druten's bedroom while pornography played on the television. She recalled touching the tip of his erect penis, which was protruding from his shorts or underwear, and there was a liquid substance there. She did not recall whether he asked her to do that. She recalled rushing to the bathroom, washing her hands, wiping them off, and leaving the room. As a teenager, S. had disclosed the incident to G., her boyfriend at the time. When she was 22, she and G. confronted Van Druten regarding the incident while her mother was present, but her mother "was distracted" and "there was not a reaction out of them."

### A. (Victim)

A., now six years old, testified at trial. She said that Van Druten had shown her his "bird" "more than once," but she had never touched it. He only showed her his bird when everybody else was in a different room. It made her feel "gross" when he would show it to her.

She testified she had seen "white stuff" come out of his "bird"; afterward "he would just wipe it off." She also testified that he showed her a video on a tablet; she saw "white stuff come out of the boy's birds and into the girl's mouths." It made her feel "gross."

She testified that grandpa did not touch her vagina and that she did not recall previously testifying that she said he had. She did not recall whether she had held his "bird" while he went "pee." She did not recall telling her mother that grandpa's "canary" is pink.

A. did recall Van Druten telling her not to tell her parents, but she did not recall what he would say when he told her not to tell her parents. The following exchange occurred:

"Q. What made you think that he didn't want you to tell your mom or your dad?
A. Because every time when he did it, he closed the door.
Q. And that would be because he didn't want anyone to see?

A. Yes.

Q. Okay. [A], what would he do? Can you tell us the truth and tell us what he would do when he would close the door?

A. Yes.

Q. What would he do?

A. He would do gross stuff.

When asked what she meant by "gross stuff," A. testified that "he would, like, always— he would—he would—he would tell me to pee on him," and that she did that one time, in his bathroom. She testified she did not remember what other bad things grandpa did with her.

Portions of A.'s testimony at a prior hearing were read for the jury. In prior testimony, A. described how grandpa would do "bad stuff" in his bedroom—that he wanted her to touch his "bird," which meant penis, and that she did touch grandpa's bird with her hand more than once. She did not want to touch it, but she felt that she had to. She would hold her hand still. Grandpa would tell her he wanted her to "touch his bird"; this happened in the bathroom. Grandpa also touched his own bird in the bathroom, when he was standing up and lying down.

More than once A. saw "white stuff" come out of grandpa's bird and go "on his belly"; he would wash it off in the sink. More than once A. held grandpa's "bird" when he was "going pee" in the toilet. More than once grandpa's hand touched A.'s vagina. This happened when A. had clothes on and when she had clothes off. More than once he told her, "I like your vagina." Sometimes grandpa asked to see her go to the bathroom and watched her go to the bathroom.

Sometimes grandpa would show her movies on his phone where the people had no clothes. This happened when she was on his bed with him. A. testified the people were "[d]oing the same thing that me and my grandpa did"—"me touching his bird." More than once, grandpa kissed her on her lips when she was in his bedroom.

She denied kissing grandpa in the bathroom, denied kissing his bird, and denied he put his "bird" in her vagina. He told her to keep it a secret, and she did, but then she told her mom, and then she told her dad.

//

*G. (Father)*

G. testified that, when they were teenagers, S. confided that, when she was five years old, "her father was watching pornography around her and he had his penis out and she actually touched it." He testified that, years later, he thought everything was different. He did not think to take precautions before moving his family into the same house as Van Druten because he "was fooled by God." He explained that Van Druten "went to church and made it seem like it would be an okay thing to do."

After he learned what had happened to A., G. was able to retrospectively identify "red flags," including how, when he came home from work, A. would be in Van Druten's room with the door closed, and how Van Druten would take A. out, "just them two," and buy her toys—"so many toys." G. testified he once overheard Van Druten whisper to A., "Remember our little secret." G. waited until Van Druten left the room and asked A. what the secret was. A. initially denied having a secret and then said the secret was that her grandfather had given her a chocolate, which she was not supposed to eat.

*Forensic Interviewer*

The forensic interviewer testified and a video of A.'s forensic interview was played for the jury.

*Dr. Jayme Jones*

Dr. Jayme Jones, a doctor of clinical psychology, testified regarding myths and misconceptions surrounding child abuse, including disclosure and reporting by victims in child molest cases. Dr. Jones testified that not all children disclose during their first forensic interview and may need second or third interviews to make disclosures. She noted that most people never disclose sexual abuse at all. Children are even less likely to disclose when the abuser lives in the same home, because there is a sense of dependency on that person and concern for other people affected by the disclosure.

Dr. Jones testified that when children decide to disclose, they normally disclose to a friend or family member. Children display a vast range of behaviors and emotions when disclosing abuse, from the "looking like a mannequin with no emotions disclosure to sobbing and hysterical to running around the room." A child may disclose one piece of information to

one adult and another piece of information to another adult, depending on their comfort level and what questions are asked. A child may also disclose incrementally, meaning she might "test[] the waters" and say a little bit about what happened, and depending on the reaction, she may or may not say more. A five- or six-year-old child may tell the story a different way each time.

Dr. Jones testified that children who are molested by people they have relationships with, like family members, teachers, or other adults, tend not to disclose immediately because the abuse happens in a relationship where the child has both positive and negative experiences, complicating things and creating a dilemma for the child.

Delayed disclosure also occurs when children feel responsible for the abuse. The longer the child does not talk about it, the more the child may feel responsible and guilty. The child may also feel shame or embarrassment.

That the abuse happens in secrecy sends a message that the child is not supposed to talk about it. And when the abuser explicitly tells the child to keep it a secret, disclosure is even less likely. Many children between the ages of four and seven do not understand that they are being molested as it is happening and only realize it as they learn about sexual norms or child abuse, often as teenagers.

Children between the ages of five and six may repress memories of abuse by not actively thinking about them or not fully encoding the memories because they are in shock. A person molested at a young age may be able to put the memory out of his or her mind for a time only to have something trigger it later in life.

Dr. Jones acknowledged generational molest and indicated it is not uncommon for people who molested children, nieces, or nephews to then molest grandchildren, great nieces, or great nephews. She explained that if no one discloses, the abuse may continue. A child molested by a family member may later want to reestablish a relationship with the abuser as an adult, hoping that the positive aspects of the relationship can be rekindled without the negative parts being there.

Dr. Jones testified that the concept of "grooming" refers to a child molester taking small steps to build a relationship and gain trust with the

child, and then to introduce sexual behaviors in a subtle manner. An example of grooming is using pornography to normalize sex and to suggest to children this is what relationships look like.

Dr. Jones testified that five- and six-year-old children are unable to remember details like dates, times, or frequency of the abuse. A child who discloses sexual abuse may recant or retract her allegation of abuse for a variety of reasons, but usually with the goal of removing a negative consequence to the disclosure. Or, a child may say something did not happen and then later say it did, because a child's comfort and willingness to talk at a particular moment, or with a particular audience, will vary. To get a child to provide specific information about the abuse, an interviewer will probably have to ask follow-up questions.

Dr. Jones testified that she had not interviewed A. or anyone else involved in the case. She had not read any of the police reports and did not know anything about the facts of this case. She was only testifying about child molest victims in general.

*Van Druten*

Van Druten testified that he was blind in one eye. His bathroom, which has a locking door, is just off his bedroom. One day, he was in his bathroom with the door shut, but not locked, while watching pornography on his tablet computer and masturbating. He noticed A. was there watching him. He had not seen the door open because of his lack of peripheral vision due to the blind eye. He testified he was "completing it," and "the white stuff [wa]s coming out the top," and he was "sort of surprised." He stated:

> "But I didn't kick her out of the room because I wanted to get up and clean myself off as fast as possible. So I cleaned myself off in the sink, zipped my pants back up, and I tried to explain to her what was going on as easy as possible without getting complex about it. She probably saw one of the videos too because I turned around, and she seen a video of what was described as unclothed people doing things that should not be seen by little kids."

Van Druten testified this happened the same day S. confronted him about what A. told her, and he thought she was referring to the masturbation. He testified he told S., "Your daughter caught me masturbating this

afternoon. I didn't touch her. She didn't touch me, and that's the only time anything ever happened."

Van Druten testified that he never touched A. inappropriately and never showed her pornographic videos other than this one, accidental time. A. was his first grandchild, and he would give her sweets, play with her, or do things like take her to the dentist.

Van Druten denied the incident involving S. occurred and denied S. ever confronted him or his wife about it. He testified the apologetic email referred to his "lifetime habit" of masturbation.

(Lodgment No. 13 at 2-13.)  After an independent review of the trial record, the Court concludes that the California Court of Appeal's opinion represents an accurate summary of the record.

## III.    PROCEDURAL BACKGROUND

### A.    Trial Court Proceedings

Petitioner was initially charged on June 9, 2017.  (Lodgment No. 1 at 10.)  On November 27, 2017, information filed "alleged eight counts of committing a lewd act on a child (§ 288. subd. (a)), each with a special allegation that the defendant had substantial sexual conduct with a child under age 14 (§ 1203.066, subd. (a)(8))."  (*Id*. at 29-33; Lodgment No. 13 at 7.)  Petitioner was also charged with "two misdemeanor counts of child molest (§ 647.6, subd. (a)(1))."  (*Id*.)

On August 10, 2018, a jury found Petitioner guilty on six counts of lewd acts upon a child and two counts of child molesting.[2]  (Lodgment No. 2 at 42-50.)  On September 20, 2018, the trial court sentenced Petitioner to a total of 18 years in state prison. (Lodgment No. 1 at 258; Lodgment No. 2 at 53-54.)  Petitioner's sentence was comprised of an upper term of eight years on count 1; one-third the middle term of two years on counts 2 through 6, consecutive; and 365 days on counts 9 and 10, concurrent.  (*Id*.)

//

---

[2] He was found not guilty of two counts of the committing a lewd act on a child charges.

### B.   Direct Appeal

On September 18, 2018, Petitioner filed for appeal.  (Lodgment No. 1 at 256.)  In his direct appeal, Petitioner raised several issues, including the issue he raises in the instant habeas petition.  Specifically, Petitioner argued that "[t]he trial court abused its discretion and violated [his] rights to due process and a fair trial when it admitted Shannon's testimony about the prior incident under evidence code section 1108." (Lodgment No. 10 at 26.)  Petitioner stated that Shannon's testimony was inadmissible under Evidence Code ("EC") section 1108 because the prior act did not amount to a "sexual offence," and the evidence should have been excluded under EC section 352.[3] (*Id.*)

On October 4, 2019, the California Court of Appeals issued an opinion affirming the judgment of the Superior Court.  (Lodgment No. 13 at 46.)  The court rejected Petitioner's argument regarding the prior act evidence involving Shannon, under EC section 1108, stating that there was sufficient evidence for the jury to conclude that Petitioner "committed a 'sexual offense' against [Shannon] by violating Penal Code section 647.6 and Penal Code section 288."  (*Id.* at 21, 24.)  The court further held that the trial court properly admitted Shannon's testimony under EC section 352 because "the evidence was probative of Van Druten's propensity to molest and commit lewd acts on a child."  (*Id.* at 24.)  Further, the evidence was not particularly inflammatory, did not take up undue amount of time, and was not confusing.  (*Id.*)  The jury instructions ameliorated any risk of the jury being tempted to convict Van Druten for the prior act.  (*Id.*) Moreover, the court held that even if admitting the prior act evidence was an error, it was

---

[3] Petitioner also raised several claims not included in his habeas petition: (1) "[t]he trial court erred and violated [his] Fifth, Sixth, and Fourteenth Amendment rights when it allowed Jayme Jones to testify regarding child sexual abuse because the testimony was inadmissible and irrelevant and any probative value was outweighed by its prejudicial impact;" (2) "the trial court erred by failing to give any limiting instruction to the jury regarding how to use Jones' testimony;" and (3) that the trial court abused its discretion by sentencing Petitioner to 18 years.  (*Id.* at 40, 68, 77.)

harmless because A's statements to her mother and during the forensic interview, as well as Van Druten's email, "were overwhelming evidence of Van Druten's guilt." (*Id*. at 25-26.)

On November 12, 2019, Petitioner sought review from the California Supreme Court. (Lodgment No. 14 at 2, 87.) On review, Petitioner presented the same issues that he had raised with the California Court of Appeal. (*See* Lodgment No. 13.) On January 2, 2020, the California Supreme Court denied Petitioner's petition for review without further comment. (Lodgment No. 15.)

### C.   Federal Habeas Proceedings

On March 30, 2021, Petitioner filed the instant federal petition for writ of habeas corpus in this Court. (ECF No. 1.)

## IV.   STANDARD OF REVIEW

This petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law," 28 U.S.C. § 2254(d)(1), "or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding." 28 U.S.C. § 2254(d)(2); *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting 28 U.S.C. §2254(d)(1); § 2254(d)(2)).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies a very deferential review, inquiring only whether the state court's decision was "objectively unreasonable." *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applied a rule different from the governing law set forth in [Supreme Court] cases, or if it decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v.*

*Taylor*, 529 U.S. 362, 405-06 (2000)).  A state court is not required to cite Supreme Court precedent when resolving a habeas corpus claim, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  *See Early*, 537 U.S. at 8.  For purposes of § 2254(d), clearly established federal law, means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) (citing *Williams*, 529 U.S. at 405, 413).

"The court may grant relief under the 'unreasonable application' clause if the state court correctly identifie[d] the governing legal principle from [Supreme Court] decisions but unreasonably applie[d] it to the facts of the particular case."  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 407-08).  To meet the "unreasonable application" standard, a "state court's decision [must] be more than incorrect or erroneous."  *Lockyer* 538 U.S. at 75 (citing *Williams*, 529 U.S. at 410, 412).  Further, a federal court reviewing a habeas petition "must determine what arguments or theories supported, or . . . could have supported, the state-court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  This is an extremely deferential review and imposes a heavy burden on the Petitioner to prove that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.

To determine if "a decision was based on an unreasonable determination of the facts in light of the evidence presented," the state court's factual findings "are presumed correct absent clear and convincing evidence to the contrary."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. 2254(e)(1)).  A state court's decision "will not be overturned on factual grounds unless" its factual determinations were "objectively unreasonable in light of the evidence presented in state court."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)); 28 U.S.C. § 2254(d)(2); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing

the record might disagree" does not render a decision objectively unreasonable).  Federal habeas court must consider all evidence "in the light most favorable to the prosecution." *See Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  To grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (citing *Lockyer v. Andrade*, 538 U.S. at 75) *overruled on other grounds by Murray v. Schirro*, 745 F.3d 984, 999-1000 (9th Cir. 2014), *as recognized in Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 n.3 (9th Cir. 2019).

When state's highest court does not provide a reasoned decision, the Court "look[s] through" it to the underlying appellate court decision and presumes that the higher court's "unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1996).  Although not entitled to perform a de novo review, if the dispositive state court does not "furnish a basis for its reasoning," federal habeas courts must conduct "an independent review of the record . . . to determine whether the state court clearly erred in its application of controlling federal law." *Delgado v. Lewis*, 223 F.3d 976, 981, 982 (9th Cir. 2000) (citing *Tran v. Lindsey*, 212 F.3d 1143, 1153 (9th Cir. 2000)), *overruled on other grounds by Lockyer*, 538 U.S. at 75-76; *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (citing *Delgado*, 223 F.3d at 982).

## V.   DISCUSSION

In this federal habeas petition, the only argument Petitioner makes is that "[t]he trial court's decision to admit [Shannon's] testimony regarding an alleged prior incident under [EC] section 1108 rendered [P]etitioner's trial fundamentally unfair, and the California Court of Appeal's rejection of this claim resulted in a decision that was based on an unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2).[4]  (ECF No. 1-2 as

---

[4] Respondent addresses various reasons for denying Petitioner's petition, including issues arising under 28 U.S.C. § 2254(d)(1). (ECF No. 7. Doc. 7-1, at 5-6).  However, Petitioner does not raise arguments

2, at 7-8, 14.)

### A.   Due Process Violation and Analysis Under Sections 1108 and 352

EC section 1108 states, "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  Cal. Evid. Code § 1108.  Petitioner argues that admission of Shannon's testimony under this code section denied him due process because it "so grossly distorted the focus of the trial."  (ECF No. 1-2 at 18-19.)

However, the California Supreme Court has held that EC section 1108 does not violate defendant's constitutional rights to due process.  *People v. Falsetta*, 21 Cal. 4th 903, 916 (1999).  The Court explained the legislative reason behind section 1108: "By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." *Id.* at 915.

Moreover, Section 1108 gives the court discretion to exclude evidence under section 352, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." *Id*. (citing Cal. Evid. Code. § 352)  Section 352 also provides a safeguard against possible undue prejudice from admitting defendant's previous offenses.  *Id*. at 915 ("[I]n light of the substantial protections afforded to defendants in all cases to which section 1108 applies, we see no undue unfairness in its limited exception to the historical rule against

---

under § 2254(d)(1) in his petition, and any argument not raised in the petition is considered waived. *See Degracia v. United States*, 2008 U.S. Dist. LEXIS 81793, at *6 (S.D. Cal. Oct. 15, 2008); *Cooper v. Calderon*, 255 F.3d 1104, 1110 (9th Cir. 2001).  Thus, the Court will not address this alternate prong for habeas relief.

propensity evidence.").  "By reason of section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in careful weighing process under section 352."  *Id*. at 916-17.  Trial courts shall consider certain factors, such as:

> [Prior offense's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing,  misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.

*Id*. at 917.

Here, the trial court engaged in a careful section 352 analysis prior to admitting Shannon's testimony.  (*See* Lodgment No. 4 at 39.)  The court concluded that Shannon's testimony about the prior act was admissible under section 1108 because "[i]t [was] similar conduct, it was not unduly time consuming, and unlikely to confuse or mislead the jury."  *Id*.  The court further stated that even though the conduct was remote in time, according to our precedent (the court cited *People v. Waples*, 79 Cal. App. 4th 1389 (2000)), the conduct was not too remote.  *Id*.  The conduct was also "no more inflammatory than the instant offenses."  *Id*.  The California Court of Appeal agreed with the trial's court assessment of the evidence under sections 352 and 1108.  (*See* Lodgment No. 13 at 24-26.)

Further, the Court explained that section 1108 was modeled after Federal Rules of Evidence 413 and 414, which have similarly been upheld by federal courts under constitutional attack.  *Id.* at 921 (citing cases).  Those cases held that because the federal rules still require application of Rule 403, the federal equivalent of section 352, "the possible exclusion of unduly prejudicial evidence saves federal rules 413 and 414 from attack on due process grounds."  *Id.*

Accordingly, the record does not support Petitioner's argument that admission of Shannon's testimony regarding the prior act denied Petitioner due process.

### B.    Permissible Inferences and Similarity of the Two Incidents

Petitioner further argues that his due process rights were violated because "no permissible inference could be drawn from Shannon's testimony."  (ECF No. 1-2 at 19.)  Petitioner states, "the only inference actually supported by the evidence was the impermissible inference that Shannon's testimony regarding petitioner's actions 25 years earlier was correct and that petitioner was thus the sort of person of bad character who would also have committed the crimes charged against A." *Id*. at 20.  Petitioner also argues that "[t]he nature of Shannon's testimony rendered [his] trial fundamentally unfair." (*Id.* at 24.)  According to Petitioner, the admission of evidence "had a dangerous tendency to prove petitioner's guilt through an improper inference that he was disposed to committing that crime, and necessarily engendered a desire on the part of the jury to punish petitioner for both incidents." *Id*.

EC section 1108 specifically allows admission of prior sex crimes, in a sex offense case, to show accused's "propensity to commit such crimes." *Falsetta*, 21 Cal. 4th at 907; *see Uribe v. Knowles*, 2005 U.S. Dist. Lexis 37273, No. C 03-5700 SI (pr) (N.D. Cal. Sept 15, 2005) (stating that evidence of previously committed sexual battery against a minor did not violate petitioner's due process rights because the jury could draw a permissible inference that petitioner had the propensity to commit sex offenses).  This section was enacted by the legislature precisely "to expand the admissibility of disposition or propensity evidence in sex offense cases" and "was intended in sex offense cases to relax the evidentiary restraints section 1101," the section of the evidence code that generally prohibits propensity evidence. *Falsetta*, 21 Cal. 4th at 911.  As such, "section 1108 implicitly abrogates prior decisions of this court indicating that 'propensity' evidence is per se unduly prejudicial to the defense." *Id.*  Thus, the code section permits the jury to draw a permissible inference from Shannon's testimony regarding the prior sexual act that Petitioner had propensity to commit such acts.

Petitioner next argues that because the two incidents were so dissimilar "no permissible inferences that tended to make 'any fact of consequence more or less probable' could have been deducted."  (ECF No. 1-2 at 21.)  Petitioner relies on *Kipp v. Davis*, 971 F.3d 939, 954-955 (9th Cir. 2020), where the Court of Appeal held the admission of the evidence of a prior crime unreasonable under § 2254 (d)(2) because the trial court ignored numerous dissimilarities between the two crimes.  Petitioner argues that the Court of Appeal in this case also "ignored the significant differences between the two incidents."  (ECF No. 1-2 at 24.)

However, in *Kipp*, the evidence of a prior crime was not admitted under EC section 1108, but under EC section 1101 to show common identity and intent.  971 F.3d at 943.  Section 1101 requires the prior act to be very similar to the charged offence to be admissible.  *See People v. Weathers*, 274 Cal. App. 2d 232, 238 (1969) (noting that "[t]o be helpful in establishing identity, the methods used in both crimes must be so similar that it is logical to conclude that the crimes were committed by the same person.  This similarity must be shown [by] unique and distinctive features or techniques exhibited by the perpetrator.  It is not sufficient to show that the crimes were both of the same type, e.g., both were robberies or both were rapes.").  Thus, in *Kipp*, the court found that the state court erred by ignoring evidence that the two "crimes were too dissimilar to support an inference of connection by common identity or intent.  The state court solely mentioned the similarities between the two crimes, without any acknowledgment of the differences."  971 F.3d at 955.

By contrast, section 1108 is the evidence code at issue here, and it does not have the same similarity requirement for the evidence to be admissible.  *See People v. Mullens*, 119 Cal. App. 4th 648 (2004) (stating that because the evidence was probative to prove defendant's propensity to engage in lewd acts with children under EC section 1108, any dissimilarities between prior incidents and charged offences affected the weight, not the admissibility of the evidence); *see also People v. Soto*, 64 Cal. App. 4th 966 (1998) (holding the prior incidents admissible, even though they occurred several years before

and were not similar to the charged offense, because section 1108 explicitly allowed such propensity evidence in sexual molestation cases).

Therefore, because the Court of Appeal found Shannon's testimony regarding the prior sexual act probative of Petitioner's propensity to commit lewd acts against children, the state court did not error in not explicitly discussing dissimilarities between the two incidents.

## C.   Nature of Shannon's Testimony and Limiting Instruction

Petitioner additionally argues that the limiting instruction given by the trial court was inadequate to remedy the due process violation because the "evidence of a prior incident involving a child, in a case involving the same type of crime," was highly inflammatory. ( ECF No. 1-2 at 30.)  The Court of Appeal also concluded that the limiting instructions "properly focused the jury on the current charges and the limited manner in which it could consider the evidence of the uncharged sexual offense." (Lodgment No. 13 at 25.)

First, as discussed above, the Court of Appeal agreed with the trial court's analysis of the evidence under section 352 and concluded that the evidence of a prior act was not more inflammatory than the charged offense.  (*See* Lodgment No. 13 at 24-26.)  This Court is required to give deference to this determination. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

Here, the trial court gave a CALCRIM instruction, CALCRIM No. 1191A Evidence of Uncharged Sex Offense.  (*See* Lodgment No. 1 at 219.)  This instruction requires the jury to find by a preponderance of the evidence that the defendant in fact committed uncharged offenses in order to consider that evidence.  CALCRIM No. 1191A.  If this is met, then:

> [the jury] may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit Lewd or Lascivious Act: Child under 14 Years and Child Molesting, as charged here. If you conclude that the defendant committed the uncharged

1
2
3
4

> offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Lewd or Lascivious Act: Child under 14 Years and Child Molesting. The People must still prove each charge and allegation beyond a reasonable doubt.

5

*Id.* Courts have upheld use of this instruction as written in cases involving EC section

6

1108. *See People v. Gonzales*, 16 Cal. App. 5th 494, 501 (2017); *Chouest v. Sherman*,

7

No. CV 19-7563-SVW (JEM), 2020 WL 10540832, at *12 (C.D. Cal. June 25, 2020),

8

report and recommendation adopted, No. CV 19-7563-SVW (JEM), 2021 WL 3209907

9

(C.D. Cal. July 27, 2021). In addition, we presume "that the jurors understand and follow

10

the court's instructions." *People v. Edwards*, 57 Cal. 4th 658, 746 (2013) (internal

11

citation omitted).

12

Therefore, the Court concludes that the state court did not error in giving this

13

limiting instruction.

14

## D.    Harmless Error

15

Finally, the Court of Appeal held that any possible error in admitting Shannon's

16

testimony was harmless because A's statements to her mother and during the forensic

17

interview, as well as Petitioner's own email, were overwhelming evidence of his guilt.

18

(Lodgment No. 13 at 25.) The Court agrees that, even if there was any error on the above

19

grounds, the error was harmless.

20

Under the harmless standard applicable on federal habeas review, a constitutional

21

error only warrants habeas relief if the court determines that "the error had substantial

22

and injurious effect or influence in determining the jury's verdict." *Brecht v.*

23

*Abrahamson*, 507 U.S. 619, 637 (1993) (quoting and adopting harmless error standard

24

created in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The judge asks

25

directly, "Do I, the judge, think that the error substantially influenced the jury's

26

decision?" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). If a federal habeas judge is

27

in "grave doubt" about whether a constitutional trial error "had substantial and injurious

28

effect or influence in determining the jury's verdict," the error is not harmless and "the

petitioner must win." *Id.* at 445. However, Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Brecht*, 507 U.S. at 637.  If a state court has found that a constitutional error was harmless, the federal habeas court must determine whether that finding was objectively unreasonable. *Davis v. Ayala*, 767 U.S. 257, 269 (2015).  In such instances, "the *Brecht* test subsumes the limitations imposed by AEDPA." *Id.* at 270.

In this case, there was substantial evidence outside of Shannon's testimony.  The evidence against the Petitioner included A's pre-trial statements, A's testimony, Dr. Jones's testimony, and Petitioner's own email.  The Court of Appeal reasonably held as such.  Therefore, any potential error of admitting Shannon's testimony regarding the prior sexual act did not have a "substantial and injurious effect" in determining the jury's verdict.  The error was harmless.

## VI.   CONCLUSION AND RECOMMENDATION

Accordingly, for all of the foregoing reasons, the Court recommends that Petitioner's habeas petition be **DENIED**.

The Court submits this Report and Recommendation to United States District Judge Roger T. Benitez under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **<u>August 31, 2022</u>**.  The document should be captioned "Objections to Report and Recommendation."

//

//

//

//

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **September 14, 2022**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  August 17, 2022

Hon. Nita L. Stormes
United States Magistrate Judge

3:21-cv-00555-BEN (NLS)